Argued and submitted March 22, affirmed May 22, 2013

STATE OF OREGON,
*Plaintiff-Respondent,*
*v.*

ROBERT LOUIS ASHBAUGH,
*Defendant-Appellant.*

Wheeler County Circuit Court
090002CR; A147736

301 P3d 972

Marc D. Brown, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Tiffany Keast, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.*

EGAN, J.

---

* Egan, J., *vice* Wollheim, J.

**EGAN, J.**

Defendant appeals a judgment convicting him of second-degree escape, ORS 162.155, assigning error to the trial court's denial of his motion for judgment of acquittal (MJOA). Defendant contends that there was insufficient evidence from which a rational trier of fact could find that he was in custody and that he used or threatened force while escaping. We affirm.

Because this case arises from defendant's MJOA, we state the facts in the light most favorable to the state. *See State v. Alexander*, 238 Or App 597, 599, 243 P3d 476 (2010), *rev den*, 349 Or 654 (2011). At the time of the relevant events, defendant was on post-prison supervision (PPS), a condition of which was that defendant submit to a mental health evaluation. Defendant's PPS supervisor told defendant on multiple occasions that he was required to have the mental health evaluation completed and eventually told defendant that he would receive sanctions if he failed to comply with that PPS condition. Ultimately, the supervisor called defendant to inquire about whether he had undergone the evaluation and, when defendant told the supervisor that he was not going to submit to the evaluation, told defendant to report to a particular jail to receive sanctions. Defendant told his supervisor that he would not do so.

As a result, a detention warrant was issued for defendant's arrest. Two police officers, Osborn and Garibay, went looking for defendant and encountered him outside of a restaurant. Garibay told defendant that they needed to talk with him and that they had a detainer for his arrest. Defendant responded that he would not go with them and ran away from the officers. The officers chased him, telling him to stop because he was under arrest.

Defendant crossed a creek that was behind the restaurant. From across the creek, defendant asked the officers why they were chasing him. Osborn responded that they had a warrant and were placing defendant under arrest. Defendant did not respond and continued to run from the officers. Garibay then crossed the creek, while Osborn pursued defendant on the other side. At some point, defendant told the officers, "If you want a war, you just wait. We're going to

have a war. You better watch your back." Osborn once again told defendant to stop because he was under arrest. Defendant said to Garibay, "Come on, fat boy. You want a war, you got one."

The officers eventually lost track of defendant. After searching for about 10 minutes, they found him hiding under a tree, and, as they approached him from different directions, defendant told them that he would cooperate with them. Garibay, who was approximately 15 to 20 feet from defendant, instructed him to put his hands up and allow the officers to arrest and handcuff him. Garibay had drawn his Taser and pointed it at defendant. Defendant asked Garibay what he was going to do with the Taser, and Garibay responded that, if defendant did not comply and allow Osborn to put handcuffs on him, then he would shoot defendant with the Taser. Defendant told Garibay that, if he shot him with the Taser, defendant would come after Garibay. Defendant then turned and ran from the officers, and Garibay shot him with the Taser, which hit and immobilized him.

The officers tried to handcuff defendant but had difficulty because he was swinging his arms around and kicking his legs. Garibay activated his Taser again, holding the trigger down until Osborn was able to handcuff defendant.

Defendant was charged with escape in the second degree, ORS 162.155, for unlawfully and knowingly threatening to use physical force to escape from custody.[1] After the state submitted evidence of the foregoing events, defendant moved for a judgment of acquittal on the escape count. The trial court denied defendant's motion and found him guilty of second-degree escape.

Defendant appeals, contending that the court erred in denying his MJOA. "We review a trial court's denial of a motion for judgment of acquittal to determine whether, viewing the evidence in the light most favorable to the state, a rational trier of fact could have found that the state proved all the essential elements of the offense beyond a reasonable

---

[1] Defendant was also charged with, and convicted of, resisting arrest, ORS 162.315. He does not challenge that conviction on appeal.

doubt." *State v. Kaylor*, 252 Or App 688, 691, 289 P3d 290 (2012), *rev den*, 353 Or 428 (2013). Defendant contends that the state's evidence was insufficient to establish that he was in custody and that, assuming that he was in custody, the state's evidence was insufficient to establish that he threatened to use physical force while escaping from custody.

A person commits second-degree escape if, among other things, the "person uses or threatens to use physical force escaping from custody[.]" ORS 162.155(1)(a). Escape is defined as the "unlawful departure of a person from custody[.]" ORS 162.135(5). Custody is defined as "the imposition of actual or constructive restraint by a peace officer pursuant to an arrest[.]" ORS 162.135(4). Thus, a person commits second-degree escape if, among other things, the person uses or threatens to use physical force while unlawfully departing from the imposition of actual or constructive restraint by a peace officer pursuant to an arrest.

Defendant contends that he was never in custody and, thus, could not escape from custody, because the officers never actually or constructively restrained him. The state does not contend that the officers actually restrained defendant and, instead, contends that the officers constructively restrained defendant. Defendant challenges that contention, arguing that a person is not constructively restrained unless that person is under the physical control of a peace officer. We disagree.

Constructive restraint is "control that is imputed as a matter of law, even if the control does not exist in fact." *Alexander*, 238 Or App at 603. Imposition of constructive restraint depends on whether the restraint was for the purpose of arrest and whether, in the totality of the circumstances, the peace officer's purpose to apprehend the person was manifested. *Id.* at 603-04. Although no "particular oral litany is necessary to establish constructive restraint," *id.* at 603, a person is under constructive restraint when an officer tells the person that he is under arrest. *See State v. Thomas*, 229 Or App 453, 460, 211 P3d 979, *rev den*, 347 Or 349 (2009) (concluding that a defendant was in custody because an officer stated "words of arrest manifesting the purpose of

apprehending a defendant"). Thus, an officer's statements are sufficient to establish constructive restraint over a person even without the officer imposing physical control over the person.

It is possible that, as defendant fled from the officers, the officers constructively restrained him numerous times because the officers repeatedly told defendant that he was under arrest. Nonetheless, he was charged with a single count of escape, and therefore, to affirm, we need only conclude that the evidence was sufficient for a rational trier of fact to have found the facts necessary to convict defendant of a single instance of second-degree escape. Therefore, we focus our analysis on the events following when the officers found defendant hiding under the tree because we conclude that they are determinative.

The evidence, viewed in the light most favorable to the state, establishes that defendant acquiesced to the control of the officers when he told them that he would comply with them and that the officers approached defendant from different directions to prevent him from continuing to flee. Furthermore, Garibay pointed his Taser at defendant, told defendant to allow Osborn to handcuff him, and told defendant that, if he did not comply, Garibay would shoot him with the Taser. From that evidence, a rational trier of fact could have found that the officers manifested an intent to apprehend defendant, both in commanding defendant to allow the officers to handcuff him and in their actions of surrounding him and using the threat of shooting him with a Taser to force defendant to comply. We therefore conclude that there was sufficient evidence in the record from which a rational trier of fact could find that, when Garibay told defendant to allow Osborn to handcuff him or Garibay would shoot him with the Taser, defendant was constructively restrained and, consequently, in custody.

Furthermore, there is sufficient evidence in the record to conclude that defendant escaped from custody. A person escapes from custody when the person "sets out on a course of action and that setting out results, *even momentarily,* in the person no longer being within the peace officer's restraint or control." *State v. Metcalfe,* 172 Or App

501, 505, 19 P3d 374 (2001) (emphasis added). In *Metcalfe*, the defendant was brought to a courtroom by a police officer for a criminal hearing. The officer removed the defendant's handcuffs and told him to sit in a chair at counsel table and remain there. After sitting for a period of time, the defendant jumped up from his seat, pushed off of the officer, and ran toward a door in the back of the courtroom, where he was subdued by other officers. We concluded that a reasonable trier of fact could have found that the defendant had escaped from custody at the time that he pushed off of the officer because, "however momentarily," he was no longer within the officer's effective restraint or control. *Id.* at 506-07.

Here, the evidence, viewed in the light most favorable to the state, establishes that, after Garibay commanded defendant to allow himself to be handcuffed by Osborn, defendant turned and ran away from the officers. Similar to the situation in *Metcalfe*, the defendant did not get very far before being subdued. Nonetheless, a reasonable trier of fact could find that, by turning and running from the officers after issuing a threat, defendant was, however momentarily, no longer within their effective control. To hold otherwise would establish a perpetual state of constructive custody that arose after the officer told defendant that they had a warrant and that he was under arrest, without regard to defendant's conduct of running from the officers. We therefore conclude that the record contains sufficient evidence to establish that defendant escaped from custody.

Finally, defendant contends that, even assuming he was in custody and escaped from custody, the court erred in denying his MJOA because the evidence was insufficient to establish that he used or threatened to use physical force while escaping. He contends that his statement to Garibay that, if Garibay shot him with the Taser, he would come after Garibay, was insufficient to constitute a threat to use physical force while escaping from custody because it was conditional and also because it was intended to prevent Garibay from shooting him with the Taser, rather than to facilitate his escape.

A rational trier of fact could find on this record that defendant threatened physical force while escaping. The statement that one person is going to "come after" another person can rationally be understood to be a threat of violence. Furthermore, the threat can be rationally understood to be defendant's attempt to eliminate a restraint that was placed on him to keep him within the officers' control—*viz.*, Garibay's threatened use of the Taser—to enable defendant to escape from custody. That is particularly the case in light of defendant turning and running from the officers after making the threat. Thus, defendant's threat could rationally be understood to have been an effort to threaten physical force to facilitate his escape from custody, which is precisely the conduct that second-degree escape criminalizes. We therefore conclude that a rational trier of fact could find that defendant threatened the use of physical force while escaping from custody. Consequently, the trial court did not err in denying defendant's MJOA.

Affirmed.